UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

YENNES FOOD MART                                                                    PLAINTIFF

v.                                                         CIVIL ACTION NO. 3:16CV-624-CRS

UNITED STATES OF AMERICA, UNITED
STATES DEPARTMENT OF AGRICULTURE,
FOOD AND NUTRITION SERVICE                                                          DEFENDANT

# **MEMORANDUM OPINION**

This matter is before the court for consideration of the motions of plaintiff Yennes Food Mart ("YFM") and of defendant United States of America, United States Department of Agriculture, Food and Nutrition Service ("United States") for summary judgment. DNs 15, 16. The United States has also moved to strike YFM's "Resply [sic] to defendant's motion for summary judgment." DN 18. We will address the motion to strike first.

The parties agreed to the deadlines of May 30, 2017 for the filing of dispositive motions, June 27, 2017 for responses to those motions, and July 19, 2017 for replies to the motions. The United States filed a motion for summary judgment on May 30th. DN 15. Instead of filing a response by the deadline, YFM filed its own summary judgment motion (DN 16) on June 27, 2017, twenty-seven days after the deadline and without an accompanying motion for leave to file the motion out of time. It did not file a timely response to the United States' motion. Instead, it filed a "resply [sic] to defendant's motion for summary judgment" (DN 17) on July 17th. This filing is clearly a response to the United States' motion. It, too, was filed well out of time and

without an accompanying motion for leave to file late. The United States filed a response to YFM's motion for summary judgment noting that it was filed out of time without leave of court to do so. DN 19. It also filed a motion to strike the untimely and unauthorized response to its motion. DN 18.

Not only did YFM fail to comply with the agreed deadlines and filed out-of-time pleadings without seeking leave of court to do so, but it simply chose not to respond to the motion to strike. The present posture of the matter might thus warrant the striking of YFM's filings, and consideration of the motion of the United States as unopposed, in light of its decision to ignore the motion to strike and to continue to exhibit complete disregard for the order of this court establishing the deadlines in issue. Orders of the court are to be respected.

However, the court, in its discretion, will deny the motion to strike YFM's response (ne Resply) and will also consider its motion for summary judgment, in order to afford a full and fair review of the agency's decision.

This matter comes before the court for a *de novo* review of the final agency decision of the U.S. Department of Agriculture, Food and Nutrition Service ("USDA") upholding the charge of trafficking in SNAP benefits and permanently disqualifying YFM from participating in the SNAP program.[1]

Hussein Yennes ("Yennes"), sole owner and officer of Yennes Market, Inc., was notified of the trafficking charge against his store, YFM, by letter dated May 23, 2016. He responded by letter dated May 30, 2016 and by telephone June 1, 2016.[2] The USDA considered the

---

[1] In 2008, Congress amended the Food Stamp Act, renaming the Food Stamp Program the Supplemental Nutrition Assistance Program ("the SNAP"). *See* Food, Conservation, and Energy Act of 2008, Publ. L.No. 110-246, 122 Stat. 1651, 1853. *See also, Alkabsh v. United States*, 733 F.Supp.2d 929 (W.D.Tenn. 2010).
[2] The record is unclear whether the phone call, apparently between Angie [last name unknown], on behalf of Yennes and Christine Storley of the USDA, took place on June 1st or June 3rd. DN 20, PageID #529. The USDA sent a letter concerning the phone call and indicated that certain supporting documentation concerning Yennes' explanation

explanations offered, and responded by letter dated June 6, 2016 concluding that trafficking occurred at YFM and informing Yennes that the determination would become final unless he submitted a timely request for review. By letter dated June 16, 2016, attorney Paul Hobbs requested a review on behalf of Yennes and YFM. The USDA acknowledged the request and indicated that Yennes must file support for his explanation of the store transaction activity within twenty-one days of receipt of the acknowledgment. Attorney Hobbs filed a written response and a number of items of documentation. The USDA conducted a review of the response and documentation and determined that Yennes did not provide sufficient evidence to refute the allegations. Yennes was provided a copy of the August 31, 2016 final agency decision which concluded that "based on a review of all of the evidence in this case, by a preponderance of the evidence, it is more likely true than not true that program violations did occur as charged by Retail Operations. Based on the discussion herein, the decision to impose a permanent disqualification against [YFM] is sustained." DN 20[3], PageID #556. Yennes was advised of his right to seek judicial review. *Id.* This action followed.

The matter is now before the court on motion of the United States for summary judgment. An aggrieved retailer bears the burden of proving by a preponderance of the evidence that the USDA's determination is invalid. *Warren v. United States*, 932 F.2d 582, 586 (6th Cir. 1991). Where he fails to affirmatively establish that a genuine issue of fact exists material to this burden, entry of summary judgment is proper. *See McClain's Market v. U.S.*, 214 Fed.App'x. 502, 505 (6th Cir. 2006), *citing Kahin v. United States*, 101 F.Supp.2d 1299, 1303 (S.D.Cal. 2000)(to survive summary judgment, a plaintiff in a Food Stamp Program[4] disqualification case

---

related via telephone must be provided within ten days. *Id.* The precise date is immaterial to the decision, however, as all of Yennes' explanations were addressed by the agency on review.
[3] DN 20 is the Amended Administrative Record.
[4] SNAP benefits administered through the EBT system were formerly referred to as "food stamps."

must raise material issues of fact as to each alleged violation). The well-established standard for summary judgment applies.

Before granting a motion for summary judgment, the Court must find that "there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]here the moving party has the burden—the plaintiff on a claim for relief or defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotations and emphasis omitted).

The Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must show that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence ... of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When both parties move for summary judgment, this Court "must evaluate each motion on its merits and view all facts and inference in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

The following underlying facts are not in dispute.

Hussein Yennes has owned Yennes Food Mart for approximately twelve years. It is a small grocery store located in the lower level of the J.O. Blanton House in downtown Louisville,

Kentucky, providing housing primarily to low income tenants. The store is approximately 750 square feet with no exterior entrance or outside signage. The store visit report documented, and the photographs confirm, that there were approximately five handheld shopping baskets, and no shopping carts were visible. Yennes states that the store does have shopping carts which are kept in a closet due to constraints on space. There was one point of sale ("POS") device, one register, and no optical scanner. The checkout area consisted of a 2.5' x 4' counter. YFM carried some staple foods, fresh produce, refrigerated or frozen meat and dairy items, and accessory food items.[5] The store was poorly lit, there were expired and outdated foods, and empty shelving. The store also sold a number of SNAP-ineligible items including tobacco, household goods, shirts, cleaning supplies, charcoal, health and beauty items, and paper products. It offered no expensive food items, bulk or specialty items for sale. The store does not sell alcoholic beverages.

YFM became an authorized SNAP firm[6] in 2004. SNAP benefits are provided to eligible households through the Electronic Benefit Transfer ("EBT") card system. The function of the SNAP program is "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." 7 U.S.C. § 2011. SNAP firm owners must certify that they understand and will comply with the program regulations. 7 U.S.C. § 2021(a) and (b)(3)(B), and 7 C.F.R. § 278.6(a) establish permanent disqualification as the penalty for the first instance of trafficking in SNAP benefits.

Trafficking means:

(1) The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and

---

[5] Items such as carbonated and uncarbonated drinks, condiments, candy, and spices are referred to as "accessory food items."
[6] The term "firm" is used to describe a business authorized to operate under SNAP.

signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone;

7 C.F.R. § 271.2. 7 U.S.C. § 2023 provides that "If the store…feels aggrieved by such final determination, it may obtain judicial review by filing a complaint against the United States for the district in which it resides or is engaged in business…"

The Food and Nutrition Service ("FNS") of the USDA administers the SNAP. 7 CFR 271.3. The USDA has determined that "most trafficking occurs in smaller retail food stores…" H.R. 104-651, at 68-69 (June 27, 1996) reprinted in 1996 U.S.C.C.A.N. 2183, 2201. The FNS monitors store activity through a computer program known as ALERT.[7] ALERT identifies irregular or unusual patterns of transactions that may indicate trafficking activity.

YFM's transactions processed through the EBT system triggered ALERT in early 2016 to patterns consistent with possible trafficking violations. FNS then opened a file to further investigate the activity. FNS performed an analysis of SNAP EBT transaction data from August 2015 through April 2016, an apparently arbitrarily chosen period for review of a store's transaction data. FNS found two patterns which were indicative of trafficking: (1) multiple transactions made from individual benefit accounts within unusually short time frames, and (2) excessively large purchase transactions made from recipient accounts. On May 13, 2016 an FNS investigator made a store visit which resulted in the Store Visit Report and the observations about the premises which were set forth earlier herein.

The Summary of Evidence in the ALERT Case Analysis Document[8] states that:

Multiple withdrawals were made from the account of a single SNAP household within unusually short time frames. For the review period, there are 79 sets of

---

[7] The Anti-Fraud Locator Using Electronic Benefit Retailer Transactions Program.
[8] The ALERT Case Analysis Document is a compilation of the reports and synthesized electronic data which concluded, in this case, in a recommendation that issuance of a charge letter to Yennes Food Mart for trafficking was warranted. DN 20, Page ID #439-459.

> violations listed completed by 24 different households. All of the multiple purchases from individual benefit accounts occurred within a 24 hour time period. The Store Visit Report does not indicate any compelling reason for customers to consider Yennes Food Mart a first choice destination to fulfill large purchases of food, or that they would have made relatively large, multiple purchases at the store within 24 hours. Multiple transactions within a 24 hour period are methods which stores use to avoid high dollar transactions that cannot be supported and are suggestive of trafficking.

DN 20, PageID #447. The summary then itemizes a number of "rapid and repetitive transactions" from the same household - $193.00, $30.00, and $152.22 – occurring one minute apart between the first two swipes[9] with the third swipe one hour later. On March 9, 2016, a household used two card swipes four hours apart in the amounts of $204.66 and $99.74 respectively. A third example cited in the summary occurred on April 9, 2016 with swipes used by a household mid-day, early evening, and the next day for $52.12, $48.32, and $119.82. *Id*.

The summary also identifies a number of "high dollar transactions" as examples, noting that there was a "series of EBT transactions that are excessively large purchase transactions made from recipient accounts." The summary listed ten such transactions occurring between October 11, 2015 and January 19, 2016 ranging in amounts from $194.80 to $287.46. DN 20, PageID #448. The summary notes that "[t]hese transactions exceed the state's average transaction for the same type of store by more than 300%...Out of 7,696 transactions conducted during the review period 223 of those had an amount of $65.86 or greater. The average transaction amount for the review period in Kentucky is $17.85." *Id.* The average transaction amount for YFM during the nine-month review period was between $13.00 and $14.00. DN 20, PageID #441.

---

[9] The SNAP benefit recipient "swipes" the magnetic strip on the EBT card through an EBT Point of Sale ("POS") device to pay for qualifying items, and the amount is electronically debited from the recipient's account.

In order to obtain the full picture of the multi-transaction and large-transaction occurrences, the FNS took a deeper dive into the area where YFM operated and into the particular purchasing patterns of specific households who transacted with YFM.

The FNS found seventeen SNAP-authorized firms within approximately one mile of YFM, including one superstore, one medium grocery store, and six combination/other stores. The FNS thus concluded that there were other shopping options within a reasonable distance which would have better pricing and food selections than YFM. DN 20, PageID #448-449.

The FNS looked at the dollar volume generated at YFM as compared to other small grocery stores located in Jefferson County, Kentucky, during the same review period, thus rendering a local comparison during that time frame and assessing YFM's overall monthly sales volume in addition to focusing on specific transactions. The FNS found that YFM had a consistently higher dollar volume, nearly two times higher, than other small grocery stores in Jefferson County, and noted that there appeared to be no reason for the difference since YFM did not offer special products or bulk items for sale and was poorly stocked.[10]

The FNS provided two detailed examples in the case analysis document which reinforced its conclusion that there was no reasonable explanation for the frequent and high dollar transactions at YFM[11] other than trafficking in SNAP benefits. DN 20, PageID # 453-459.

---

[10] The FNS mentioned that YFM had no grocery carts. Yennes disputes this point, contending carts were stored in a closet. This dispute appears to have been raised for the first time in this judicial appeal in YFM's motion for summary judgment. DN 16-1, p. 5, ¶ 10: "FNS reported that there were no shopping carts in YENNES, when in fact there [sic] in the closet and the Plaintiff presented a picture of that." There is no such picture that the court can find in the administrative record. There does not appear to be any mention of shopping carts in a closet in any of the explanations or documentation submitted to the FNS. There is no mention of carts in the Verified Complaint. The court has not been directed to such evidence. We have nothing more than a statement in a brief which does not constitute evidence in the case. In any event, it proves to be a minor point overall, as ample evidence put forth by the USDA has not been explained by Yennes. He has not come close to meeting his burden to establish, by a preponderance of the evidence, that the Final Decision of the USDA was in error.

[11] There were a total of 180 transactions which formed 79 sets of two or more suspicious transactions in amount ranging from $100.75 to $427.64. A few representative examples were discussed in detail in the report in order to show why this segment of transactions was indicative of trafficking.

The first household analysis revealed that it was "shopping and spending large dollar amounts at other well stocked stores, and clearly had means of transportation to larger, better stocked stores." DN 20, PageID # 453. The data showed that the household spent $122.81 at a supermarket, then went to YFM twenty minutes later where there were two more SNAP EBT transactions, one for $152.74 and one for $34.55, which were made forty minutes apart. The next month the same household made a $137.02 purchase at a superstore and a $40.56 purchase at a supermarket. The following day, this household engaged in two transactions at YFM less than one minute apart, one for $189.18 and one for $42.48. The data showed transactions at YFM a number of months later for $177.17 and $153.62, these transactions being less than two hours apart. The next day the household had another YFM transaction for $154.62. There was a transaction at a superstore later that same day for $17.99. DN 20, PageID #453-455.

The report contained three more sets of transactions at YFM by this same household. The report described three sets of transactions completed by another household in January, February, and March of 2016 which were also suspicious and indicative of trafficking. DN 20, PageID #457-458.

The FNS then concluded:

Based on the store visit information and analysis of transaction data during the review period, clear and repetitive patterns have been established of unusual, irregular, and inexplicable SNAP activity. The combined ALERT Scan data, the ALERT Comparison Reports, support the evidence that possible trafficking occurred at the subject store. The combined analysis of all this date confirms that a charge letter is warranted.

DN 20, PageID #459.

The USDA sent Yennes a charge letter on May 23, 2016 informing him that YFM was charged with trafficking, setting out the grounds for the charge, and attaching lists of the

transactions which had been determined to "establish clear and repetitive patterns of unusual, irregular, and inexplicable activity for [the] type of firm [such as YFM]." DN 20, PageID #473-489. The lists identified the terminal where the transaction was processed, the date, time, amount, method and type of transaction, and also included the last 4 digits of the SNAP household's account number. Yennes was informed of his right to reply to the charges by phone or in writing within ten days of receipt of the charge letter. DN 20, PageID #474.

Yennes responded by letter dated May 30, 2016, and denied trafficking in SNAP benefits.[12] In his letter Yennes stated that (1) no major food chains exist in the immediate area, (2) many low income customers use their food stamps as their only food source, (3) the elderly and single moms are protective of their cards and are careful not to overspend, (4) often the customers want to see their balance before spending more, so may add to their purchases in a minute or so, (5) some disabled individuals may do things in a different way than most, (6) SNAP benefits recipients tend to spend more on the day their benefits are credited to their cards, (7) it is unknown to Yennes how much food a household needs or how many people they have to feed, and (8) since YFM is a convenience store, it pays higher prices to buy inventory which it, in turn, passes on to its customers. Yennes submitted no documentary evidence in support of any of these contentions.

The FNS reviewed and addressed Yennes' explanations. It concluded that none of Yennes' responses explained the unusual nature of the suspect transactions, noting that the transactions were questionable "not because they exceed any limits for use, but rather because they display characteristics of use inconsistent with the nature and extent of the store's stock and

---

[12] There is a reference in the USDA's letter to Yennes of June 6, 2016 to his replies of May26, 2016 and June 1, 2016. The reference to a May 26 reply apparently refers to unsuccessful phone communications on that date. The notes in the record indicate that Yennes called the FNS and left a message. An agent of the FNS called back and left a message and phone number for Yennes to call back but he did not do so. The June 1 reply apparently refers to Yennes May 30, 2016 letter which is stamped "received June 1, 2016."

facilities and are indicative of trafficking" due to rapid and repetitive transactions and high dollar transactions inconsistent with store offerings. DN 20, PageID #496. The FNS again noted that the households analyzed engaged in transactions at superstores or supermarkets within a very short time of large and/or repetitive transactions at YFM. DN 20, PageID #494-499.

After consideration of Yennes' responses, the USDA sent him a letter dated June 6, 2016 which indicated its conclusion that trafficking in SNAP benefits had occurred at YFM. Yennes had not requested consideration of nor submitted evidence supporting imposition of a civil money penalty ("CMP") in lieu of permanent disqualification, and the USDA determined that YFM was not eligible for a CMP. YFM was permanently disqualified from participation in the program upon receipt of the letter. DN 20, PageID #500-501.

Yennes was informed of his right to submit a written request for review, which he did, through attorney Paul Hobbs. DN 20, PageID #504-505. Yennes then provided information in support of his position that YFM should be permitted to remain authorized under the SNAP. Yennes urged that his "unintentional actions" should qualify for the sanction of disqualification for one year pursuant to § 278.6 of the regulations.

Yennes argued that the majority of his customers were residents of J.O. Blanton House where his store is located, he was familiar with many of his customers, and extended credit accounts to several of the residents. Yennes claimed that from 2004 until 2015, he was in exclusive control over those accounts. He stated that around July of 2015, he began allowing his 21-year-old son, Aham Yennes, to start working alone in the store. Aham was purportedly made aware of the rules and was instructed never to allow residents to pay their account balances with EBT cards. However, Yennes claims that, during the review period when the 223 alleged violations occurred, Aham Yennes admitted "he allowed several credit account holders to pay

11

their outstanding balances with their EBT cards." DN 20, PageID #518. Aham Yennes contended that he did not understand that this action was a violation of the SNAP regulations. *Id.*

By letter dated July 20, 2016, Yennes was afforded ten days in which to "provide documentation to support that food items were purchased on credit." Yennes was required to "identify specific accounts along with corresponding dates and amounts." DN 20, PageID #533.[13]

In response, Yennes provided a one-page supplemental explanation and four photographs of notebook pages represented to be records of credit accounts. The photos depict pages of hand-written notations, mostly scratched out and illegible, which were offered to establish that credit was extended to various residents of Blanton House. Yennes indicated that when payment was made on those accounts in cash, the entry would be scratched out. The pages contain random incomplete names and numbers, but do not contain any dates or information about any purported accounts, purchases thereon, or payments. DN 20, PageID # 535-540. Yennes also explained that his "son is a young, easily manipulated individual who did not know the implications of his actions in allowing certain residents to satisfy these accounts using the program." *Id.*

The FNS analyzed the four notebook pages provided by Yennes, despite the fact that they did not comply with the specificity requirements. The FNS was able to decipher four names[14] which it input into the system to determine whether anyone by that name was associated with

---

[13] There was apparently a phone call on June 3, 2016 between someone named Angie, on behalf of Yennes, who indicated to FNS that YFM was permitting SNAP recipients to pay off store credit accounts. A letter issued from FNS on June 3, 2016 which advised Yennes that this was a violation of the regulations which would result in disqualification for one year. Yennes was given ten days in which to provide evidence identifying specific accounts, dates and amount to substantiate his claim that he was offering credit. DN 20, PageID #529. This explanation was then taken up by Yennes' attorney, Paul Hobbs.

[14] Yennes did not attempt to decipher the names or pair them with any accounts. He simply submitted the four almost completely illegible handwritten pages to the FNS. This court has been offered no further information either.

any of the households who conducted transactions with YFM during the review period. Three names were identified in the system but none of those households conducted any transactions at YFM during the review period. One name did not appear anywhere in the system. Thus, the Final Agency Decision stated:

> [Yennes] did not provide any evidence that the transactions listed are for the purchase of eligible foods rather than the result of trafficking. The evidence supports that [YFM] did not stock any unique products that were not available at other authorized stores. No itemized cash register tapes of eligible food purchases were advanced, and no inventory receipts of food stock were provided by [Yennes] to legitimize the SNAP redemptions. Given the shopping options for [households] in this area, it seems irregular that multiple large SNAP expenditures for legitimate foods were made in short times at this unremarkable small grocery store.
>
> Counsel stated that the transactions were the result of credit accounts…Since the establishment of credit accounts was advanced to explain the transactions, FNS policy requires proof that credit accounts existed at the time of the suspicious transactions…
>
> When the owner signed the certification to become a SNAP retailer, the owner confirmed his understanding of and agreement to abide by Program rules and regulatory provisions. He agreed to accept responsibility on behalf of the firm for violation of the SNAP including those committed by any of the firm's employees, paid or unpaid, new, full-time or part-time…Despite agreeing to abide by SNAP rules and regulations, [Yennes] now admits that he allowed credit accounts, a clear violation of SNAP regulations and rules…[The training] guide [provided to retailers] states that SNAP customers must pay for their purchases at the time of sale and that a retailer may not accept SNAP benefits as payment on credit accounts…The credit account records…[do not] serve to confirm that the credit was contemporaneous to the transactions listed in the charge letter…If the retailer does not provide adequate proof of purported credit accounts, FNS policy states that the appropriate penalty is permanent disqualification."

DN 20, PageID #552-554. The Final Decision thus upheld the determination to permanently disqualify YFM. Finally, the Decision also upheld the finding of the FNS that YFM did not qualify for a CMP, as he did not prove that he met the CMP requirements. DN 20, PageID #555.

The Final Decision notes that analysis of YFM's EBT transaction record was the primary basis for its determination, and that after a review of all of the evidence in the case, the FNS established by a preponderance of the evidence that trafficking did occur at YFM. DN 20, PageID #556.

EBT transaction evidence showed that of 88 different households that had flagged transactions with YFM, 55 of those households, or 62.5%, conducted SNAP transactions at a large grocery, a supermarket, or a superstore within two days of a flagged transaction at YFM. DN 20, PageID #551. The investigator's store visit established that the nature and scope of the store's operation, its stock and facilities could not account for the size of the flagged transactions which exceeded the state average transaction size for a comparable store by over 300% or the 79 sets of transactions that were rapid repeat transactions which were indicative of trafficking. While Yennes urged that many SNAP recipients use their benefits as the primary source of food and that there were no major food chains in the area, he did not provide any evidence of these contentions, such as cash register tapes or product inventory records and, in fact, the ALERT data analysis established that many of the households who had flagged transactions also engaged in SNAP EBT transactions at large groceries, supermarkets or superstores. Yennes has offered nothing to explain any of the particular suspicious transactions, and the generalized explanation concerning his clientele and their shopping patterns stands wholly unsupported.

Yennes first denied the trafficking charge by urging erratic shopping habits of his customers, but later contended that his son permitted certain customers to pay off store credit accounts with SNAP benefits, in violation of the SNAP regulations. Yennes was afforded the opportunity to provide documentation of the specific accounts, with corresponding dates and amounts of such payments, but he provided none of that information. Rather, he offered photos

...

of four practically illegible sheets of notebook paper with a number of partial names and some random numbers which were scratched out. These photos do not come close to providing the required substantiation of the purported credit accounts and payments made through EBT transactions. Yennes himself failed to offer any assistance in interpreting these pages. Despite this meager offering, the FNS considered it and attempted to match the four full names it could discern from the sheets with accounts and transactions within the review period. No credible evidence was found to explain any of the suspect transactions. The FNS left no stone unturned in evaluating any and all explanations offered by Yennes.

There were a substantial number of questionable transactions showing patterns of high dollar and rapid repetitive transactions which were not and still have not been specifically addressed by Yennes. "To survive summary judgment, a plaintiff in a Food Stamp Program disqualification case must raise material issues of fact as to *each* alleged violation. *McClain's Market*, 214 Fed.Appx. at 505, *citing Kahin*, 101 F.Supp.2d at 1303. He states on summary judgment that "customers who have an EBT card often shared their card with their household members" and Yennes "accommodated these customers by making separate SNAP transactions from their EBT card and providing separate receipts…" This statement is unsubstantiated. In fact, it is offered "upon information and belief…" in the brief. DN 16-1, PageID #382. This is not proper summary judgment evidence. Yennes also contends, as discussed earlier in the opinion, that there were a number of grocery carts stored in a closet at the store. The court cannot find the photo that Yennes contends was provided at some point. *Id.* In any event, even if grocery carts were available to customers, the limited, outdated and expired stock and lack of bulk or specialty items in this small store still remains unreconciled with the evidence of the volume of sales and the high dollar transactions revealed by the ALERT data.

In a catch-all paragraph in the summary judgment motion, Yennes states that he

> has at all times disputed FNS's conclusions as being without merit, completely unsupported by admissible evidence or proof, they are contrary to USDA Center for Nutrition Policy and Promotion and other universally recognized relevant data, they are the result of flawed formulas, statistical analysis and calculations, they are based on inadmissible lay opinion, and based on inaccurate data.

DN 16-1, PageID #383. Yennes has maintained that he did not traffic in SNAP benefits. The remaining accusations that the FNS used flawed formulas and calculations and relied on inaccurate data and inadmissible evidence are supported by neither argument nor evidence. He cites not a single case, nor does he assert any ground to challenge the authenticity of the data or the system employed by the USDA to analyze it and identify likely trafficking activity. Yennes' bald allegations on this subject need not be addressed further.

YFM's response to the United States' motion for summary judgment offers nothing substantive to controvert the thorough investigation and review afforded Yennes, and the well-founded conclusion that trafficking occurred during the review period at YFM. YFM suggests that "the Defendant's Motion for Summary Judgment rests not upon factual data but *analysis of that data and then speculative inferences.*" Nothing could be further from the truth. What YFM refers to as "speculative inferences" is instead a determination based upon analysis of the data that establishes that it is more likely true than not true that trafficking occurred at YFM. The consideration of the data and its likely origins is only the first step in determining whether trafficking occurred. The particulars of the establishment in question, and the explanations offered for the questionable transactions are thoroughly evaluated. The USDA reached a careful and reasoned decision after engaging in an extensive fact-finding process. It did not reach mere speculative inferences, as YFM suggests.

Contrary to YFM's contention, he has not identified a genuine issue of material fact which would preclude this court from concluding that the USDA correctly decided the matter and that Yennes has failed to establish by a preponderance of the evidence that the administrative action is invalid. *Warren,* 932 F2d. at 586. YFM urges that "the very fact that the Defendant raises those issues [concerning the use of SNAP benefits to pay credit accounts], in and of itself, establishes a genuine dispute of fact." He cites no authority for this suggestion and we know of none. There must be more than a "metaphysical doubt" as to a material fact. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. The non-movant must cite to particular parts of materials in the record to provide evidence on which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252. Here, the point is not whether Yennes afforded certain customers credit accounts. Taking that statement as true and accepting as true the admission of Yennes' son that he allowed a number of customers to pay their account balances with SNAP benefits, there still remains a complete absence of evidence connecting Yennes' son's acceptance of SNAP benefits for a number of account balance payoffs to any of the questionable transactions. As noted in *Burch v. U.S. Dept. of Ag., Food, and Nutrition Serv.*, 174 Fed.App'x. 328, 333 (6th Cir. 2006), "[T]here is no requirement that a liable store owner be provided with the opportunity to escape disqualification by renouncing the actions of employees. Indeed, this court has previously determined that no such provision is required. *See Bakal Bros.*, 105 F.3d at 1088-89 (holding that an innocent owner could be permanently disqualified from the program); *Goldstein v. United States*, 9 F.3d 521, 524 (6th Cir. 1993)(same)."

We reiterate that the burden rests upon the aggrieved owner, the showing of invalidity of the administrative decision must be by a preponderance of the evidence, and the evidence must raise material issues of fact as to *each* alleged violation. Yennes has fallen short of meeting that

burden. For these reasons the court will grant the motion for summary judgment of the United States and deny the motion for summary judgment of YFM. A separate order will be entered herein this date in accordance with this opinion.

March 14, 2018

**Charles R. Simpson III, Senior Judge**
**United States District Court**

**IT IS SO ORDERED.**